## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ALLEN SCOTT**                                        **CIVIL ACTION**

**VERSUS**                                              **NO. 16-15049**

**DARRYL VANNOY, WARDEN**                    **SECTION "R"(4)**

### REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

## I.    Factual Background

The petitioner, Allen Scott ("Scott"), is a convicted inmate incarcerated in the Louisiana State Penitentiary, in Angola, Louisiana.[2]  On March 21, 2009, Scott and co-defendant Conell Galle ("Galle") were indicted by a Grand Jury in Orleans Parish for two counts each of attempted second-degree murder of Nykeisha Jackson ("Jackson") and Thomas Williams ("Williams") and one count each for being a felon in possession of a firearm.[3]  Scott and Galle both entered pleas of not guilty in the case.[4]

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show, by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 10, Bill of Indictment, 3/21/09.

[4]St. Rec. Vol. 3 of 10, Minute Entry, 8/12/09.

The record reflects that,[5] at approximately 4:20 a.m. on March 21, 2009, several 911 calls were made from the area of General Taylor and Loyola Streets. Two callers reported hearing gunshots. A third caller reported that a person had been shot. The alleged shooter was not identified at any point during the calls.

Officer Juan Vara of the New Orleans Police Department (NOPD) and his Field Training Officer responded to the 2200 block of General Taylor Street. Williams was standing in the street, covered in blood from a gunshot wound to the neck. Upon entering the residence at 2204 General Taylor Street, Officer Vara saw Jackson lying on the floor with gunshot wounds to her head and chest. Officer Vara saw blood on all the walls of the residence, except the middle bathroom. Apparently, after Williams was shot in the neck, he ran throughout the residence, spreading blood as he ran.

Officer Vara escorted Williams into the residence and had him sit on a couch to await medical assistance. Thereafter, the residence was searched, which produced a crack pipe, a push rod, a ten-dollar bill and a five-dollar bill, a box of Arm & Hammer Baking Soda, and an open box of plastic sandwich bags were found in the middle bedroom. When asked to describe the perpetrators, the only description Williams and Jackson provided to Officer Vara was that the perpetrators were two black males. None of the neighbors Officer Vara spoke to witnessed the shootings. One neighbor told Officer Vara that he heard gunshots fired in the center of the residence. As a result, Officer Vara concluded that the shootings occurred in the middle bedroom where the drug paraphernalia and money were found.

---

[5]The facts were taken from the published opinion of the Louisiana Fourth Circuit Court of Appeal on direct appeal. *State v. Galle*, 107 So. 3d 916 (La. App. 4th Cir. 2013); St. Rec. Vol. 6 of 10, 4th Cir. Opinion, 2011-KA-0930, 2/13/13.

When NOPD Detective Nathan McGhee responded to the shooting at 2204 General Taylor Street, he met with Officer Vara and another responding officer and took charge of the investigation.  Upon entering the residence, Detective McGhee saw Jackson on the floor of the living room, near death, with gunshot wounds to her head, abdomen, and leg.  Williams, who sat on a sofa holding a towel to a gunshot wound to his neck, was bleeding profusely and screaming for medical attention.  Williams was reluctant to say anything and provided no relevant information to Detective McGhee.  Freddie Davis, a man Jackson knew from church, told Detective McGhee that he had been in the back of the residence when the shootings occurred, and further, saw one of the victims running to the rear of the residence.  With this statement, Detective McGhee developed a suspect, "Duke," whom he later determined was defendant Galle.

The crime scene was processed by NOPD Crime Scene Technician Bessie Patrolia ("Patrolia"), who took eleven blood samples from the crime scene.  Because he had no information that either of the perpetrators had been injured, Detective McGhee did not request testing of the blood samples.  Patrolia did not collect any latent fingerprints from the scene, nor did she collect any from the bills, crack pipe or push rod.  However, she collected one spent bullet, but no ballistics report was generated because police had no gun to link to the bullet.

Bobby Dickerson met with Detective McGhee on three occasions, including the day of the incident, the following day, and March 24, 2009.  He told McGhee that he knew Jackson from prior dealings and that he worked with Williams.  According to Dickerson, he and Williams went to the residence to purchase drugs on their way to work.  Dickerson described one suspect as being 6'4" and weighing 180 pounds, while police reports in the case reflected that defendant Scott was 5'9".  On March 24, 2009, Dickerson identified Galle from a six-photo lineup.  Subsequently, Detective McGhee prepared an arrest warrant for Galle.

Jackson admitted that she had been drinking since 3:00 p.m. on March 20, 2009, and was intoxicated in the early morning hours of March 21, 2009. Jackson further admitted that she had smoked four rocks of crack cocaine between 9:00 p.m. and 11:00 p.m. Around 10:30 p.m. or 11:00 p.m., on March 20, 2009, Freddie Davis arrived to spend the night in a spare bedroom. Davis brought a six-pack of beer with him, but he did not consume any drugs with Jackson. Around midnight or 1:00 a.m., Jackson opened her iron security door and let "Thomas" (Williams) inside. Jackson told Williams to lock the door.

Jackson had known Galle, with whom she had an on and off sexual relationship, by the name "Duke" for seven or eight months. According to Jackson, Williams had seen Galle earlier at a gas station, where Galle told Williams to come to Jackson's residence. Jackson telephoned Galle and told him that Williams was at the residence to purchase drugs. Galle responded, "Bitch, I already know that. Open up the door." When Jackson opened her interior door and exterior security door, she saw defendants Galle and Scott. While Jackson did not know defendant Scott's name, she had seen him with defendant Galle and had previously spoken with Scott, who had invited Jackson several times to "their" residence in Willowbrook Apartments in eastern New Orleans, where she met Scott's girlfriend.

After defendants Galle and Scott entered, they stood in the front room with Williams and Jackson. Jackson claimed that Galle had a large firearm with a large-capacity drum magazine inserted into the firearm. Jackson said Galle was angry and asked Williams, "Man, what the fuck you doing up in here?" Jackson asked Galle, "What is he doing in here?" and then asked Williams, "Didn't you tell me that he said for you to come here?" Williams responded in the affirmative and tried to explain himself to defendant Galle. Jackson, furious, said, "Man, guess what? All y'all get the fuck up out my house."

In response, defendant Galle removed a handgun from his waist, passed it to Scott, and told Scott, "Lay the bitch down." The next thing Jackson recalled was that she was on the floor. While she did not know it at the time, she had been shot in the head. Initially, Jackson's vision was blurred, but when she regained it, she observed Williams with blood spurting out of both sides of his neck. Jackson did not recall seeing Williams being shot. She screamed, "Man, y'all done shot this nigger in my house." Thereafter, Galle said to defendant Scott, "The bitch ain't dead. Man, this bitch ain't dead. Shoot her again." According to Jackson, Scott shot her three more times in the chest, stomach, and one of her knees. Afterward, Galle said to Jackson, "See what you made me do, you bitch? You know I loved you." He and Scott then left the residence. Jackson recalled Detective McGhee being on the scene and her pleading with him not to let her die.

As a result of being shot four times, Jackson suffered extensive injuries, requiring numerous doctor visits and several hospitalizations. Half of Jackson's intestines had been removed and her liver repaired. In addition, she had staples from the top of her breastbone to her navel. Furthermore, Jackson still had bullet fragments in her left knee, and a bullet remained lodged in Jackson's stomach, resulting in gastrointestinal problems, including bowel obstructions.

On April 13, 2009, after she was released from the hospital, Jackson identified Galle from a photo-lineup. Also, Jackson identified a crack pipe that had been in her pants pocket that night, and an accompanying metal push rod. Jackson told Detective McGhee that she could identify the shooter, but did not know his name. Jackson told McGhee that she had previously accompanied Galle to the shooter's residence.

On July 29, 2009, Jackson identified an apartment in the Willowbrook Apartments as the shooter's residence and described a female who also lived there. Detective McGhee subsequently

observed the female during surveillance and learned that Scott lived in the apartment.  On August 3, 2009, Jackson identified Scott from a photo lineup and identified him as the shooter.

Jackson testified before the Grand Jury that both Galle and Scott were involved in her shooting.  Williams testified before the Grand Jury that he and Galle were outside on the porch of the residence when another person ran into the residence and shot Jackson.  According to Williams, the person shot him in the neck as he fled the house.

NOPD Officer George Jackson, an expert in the taking, examination, and comparison of fingerprints, took Scott's fingerprints.  Scott's fingerprints matched fingerprints on an arrest register, a bill of information, and a plea of guilty form from Scott's 2006 conviction for illegal discharge of a firearm.

During pre-trial proceedings, the Trial Court denied a motion to sever offenses as to both defendants.[6]  It also denied Scott's motion to declare La. Code Crim. Proc. art. 782(A) and La. Const. art. I, § 17 unconstitutional to the extent that they allow for a non-unanimous verdict in a non-capital felony case.[7]  On March 14 through March 16, 2011, Scott and Galle were tried by a jury, and subsequently, both were found guilty of attempted second-degree murder of Nykeisha Jackson and being a felon in possession of a firearm.  However, both were found not guilty of the attempted second degree murder of Williams.[8]  The Trial Court denied Scott's motions for a new trial and post-verdict judgment of acquittal.[9]  On April 8, 2011, the Trial Court sentenced Scott to

---

[6]St. Rec. Vol. 1 of 7, Motion to Sever, 1/25/11; St. Rec. Vol. 3 of 7, Minute Entry, 3/4/11; St. Rec. Vol. 7 of 10, Motion Hearing Transcript, 3/4/11.

[7]St. Rec. Vol. 1 of 10, Motion Regarding Unanimous Verdict, 3/14/11; St. Rec. Vol. 5 of 10, Trial Transcript, pp. 23-24, 3/14/11.

[8]St. Rec. Vol. 7 of 10, Trial Minutes, 3/14/11; Trial Minutes 3/15/11; Trial Minutes, 3/16/11; St. Rec. Vol. 5 of 10, Trial Transcript, 3/14/11; Trial Transcript, 3/15/11; St. Rec. Vol. 7 of 10, Trial Transcript, 3/16/11.

[9]St. Rec. Vol. 3 of 10, Sentencing Minutes, 4/8/11; St. Rec. Vol. 7 of 10, Sentencing Transcript, 4/8/11; St. Rec. Vol. 1 of 10, Motion for New Trial, 4/8/11; Motion for Post-Verdict Judgment of Acquittal, 4/8/11.

forty years at hard labor as to count one (attempted murder of Jackson) and ten years at hard labor as to count four (felon in possession of a firearm), both sentences to be served consecutively and without the benefit of parole, probation, or suspension of sentence.[10]

On August 19, 2011, the Trial Court adjudicated Scott as a fourth felony offender and vacated his original sentence as to count one and resentenced Scott to life imprisonment without the benefit of probation or suspension of sentence to be served consecutively with the sentence imposed on his felon in possession of a firearm conviction.[11]

On direct appeal, Scott's appellate counsel asserted three errors[12]: (1) the Trial Court erred in denying the defense's motion to sever offenses; (2) the evidence was insufficient to sustain either of Scott's convictions; and (3) the Trial Court erred in denying his motion to declare La. Code Crim. Proc. art. 782 and La. Const. art. 1, § 17 unconstitutional in that they authorize non-unanimous jury verdicts in violation of the Fourteenth Amendment's Equal Protection Clause. The Louisiana Fourth Circuit affirmed the convictions and sentences, finding no merit in the issues raised, but remanded for imposition of a fine on February 13, 2013.[13]  On March 7, 2013, the Trial Court resentenced Scott imposing a fine as to count four.[14]

---

[10]St. Rec. Vol. 3 of 10, Sentencing Minutes, 4/8/11; St. Rec. Vol. 7 of 10, Sentencing Transcript, 4/8/11.

[11]St. Rec. Vol. 3 of 10, Sentencing Minutes, 8/19/11; St. Rec. Vol. 7 of 10, Sentencing Transcript, 8/19/11.

[12]St. Rec. Vol. 6 of 10, Appeal Brief, 2011-KA-0930, 11/22/11.

[13]*State v. Galle*, 107 So. 3d 916 (La. App. 4th Cir.  2013); St. Rec. Vol. 6 of 10, 4th Cir. Opinion, 2011 KA 0930, 2/13/13.

[14]St. Rec. Vol. 3 of 10, Re-Sentencing Minutes, 3/7/13.

On October 1, 2013, the Louisiana Supreme Court denied Scott's related writ application without stated reasons.[15]  His conviction was final under federal law ninety (90) days later, on January 30, 2014, when he did not file a writ application with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. Rule 13(1).

On January 13, 2015, Scott submitted, *pro se*, to the Trial Court an application for post-conviction relief in which he raised the following grounds for relief:[16] (1) his Fifth, Sixth and Fourteenth Amendment rights were violated when counsel refused to let him testify; (2) he was denied a fair and impartial jury in violation of *Batson*[17]; (3) he was denied the right to appeal based on a complete record; (4) the Trial Court erred in giving incorrect jury instructions and his counsel was ineffective for failing to object to the instructions; and (5) his appellate counsel was ineffective in failing to raise the *Batson* issue on appeal.

The Trial Court denied the writ application on April 17, 2015, finding Scott's claims of ineffective assistance of appellate counsel for failing to raise the *Batson* issue on appeal and denial of his appellate rights not to be a basis for post-conviction relief, and his claims of ineffective

---

[15]*State v. Galle*, 124 So. 3d 1107 (La. 2013) (mem.); St. Rec. Vol. 9 of 10, La. S. Ct. Order, 2013-K-0561, 11/1/13); La. S. Ct. Application for Writ, 13 K 561, 3/23/13.

[16]St. Rec. Vol. 2 of 10, Application for Post-Conviction Relief, 1/13/15.

[17]*Batson v. Kentucky*, 476 U.S. 79 (1986).  In *Batson*, the United States Supreme Court held that peremptory challenges could not be used to exclude jurors solely because of race unless a neutral reason for the peremptory challenge could be shown.

assistance of counsel in preventing him from testifying, denial of an impartial jury, and improper jury instruction to be without merit.[18]

On June 7, 2015, the Louisiana Fourth Circuit denied Scott's writ application, finding "no error in the judgment of the trial court denying relator's application for post-conviction relief on April 17, 2015."[19]  In July 2015, Scott filed an application for supervisory writs with the Louisiana Supreme Court.[20]  On September 16, 2016, the Louisiana Supreme Court denied writs, finding that Scott failed to show he received ineffective assistance of counsel under the *Strickland v. Washington*, 466 U.S. 668 (1984), standard.  As to Scott's remaining claims, the Louisiana Supreme Court found that he failed to satisfy his post-conviction burden of proof.[21]

## II.    **Federal Habeas Petition**

On September 28, 2016, the clerk of this Court filed Scott's petition for federal habeas corpus relief, in which he asserts the following grounds for relief[22]: (1) the Trial Court erred in denying his motion to sever; (2) insufficient evidence; (3) the finding of guilt by an non-unanimous jury; (4) ineffective assistance of counsel for denial of the right to testify; (5) denial of a fair and impartial jury under *Batson*; (6) ineffective assistance of appellate counsel in failing to raise the *Batson* issue on appeal; (7) improper jury instruction and failure of counsel to raise issue; and (8) incomplete record.

---

[18]St. Rec. Vol 2 of 10, Trial Court Order, 4/17/15.

[19]St. Rec. Vol. 8 of 10, 4th Cir. Order, 2015-K-0558, 6/17/15.

[20]St. Rec. Vol. 10 of 10, La. S. Ct. Writ Application, 15 KH 1321, 7/7/15 (dated 6/29/15).

[21]*State ex rel. Scott v. State*, 201 So. 3d 252 (La. 2016) (per curiam); St. Rec. Vol. 10 of 10, La. S. Ct. Order, 15-KH-1321, 9/16/16.

[22]Rec. Doc. No. 1, pp. 13-14.

In opposition to the petition, the State asserts that Scott's incomplete record claim is not exhausted, three claims are not cognizable on federal habeas review, and the remaining claims can be dismissed as meritless.

## III.  General Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[23] applies to this petition, which is deemed filed in this Court under the federal mailbox rule on September 28, 2016.[24]  The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default."  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes Scott timely filed his federal petition.[25]  However, the State contends that Scott failed to exhaust his claim that he was denied the right to appeal based on a complete

---

[23]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[24]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Scott signed and dated the petition on September 28, 2016, which is the earliest date appearing in the record on which he could have delivered the pleadings to prison officials for mailing to a federal court.

[25]Rec. Doc. No. 10.

record.  Further, the State asserts that Scott's remaining claims can be dismissed as meritless or not cognizable on federal habeas review.[26]

## IV.    __Exhaustion Doctrine__

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."  *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir.1998) (citing *Rose v. Lundy*, 455 U.S. 509, 519–20 (1982)); *Nobles*, 127 F.3d at 419.  "A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims."  *Whitehead*, 157 F.3d at 387 (citing 28 U.S.C. § 2254(b)(1)(A); *Rose*, 455 U.S. at 519–20).

The well-established test for exhaustion requires that the substance of the federal habeas claim be fairly presented to the highest state court.  *Whitehead*, 157 F.3d at 387 (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).  "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  "A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement."  *Whitehead*, 157 F.3d at 387 (citing *Picard*, 404 U.S. at 275–78).  "This requirement is not satisfied if the petitioner presents new legal theories or new factual claims in his federal application."  *Whitehead*, 157 F.3d at 387 (citing *Nobles*, 127 F.3d at 420); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001).

For exhaustion purposes, it also is not enough for a petitioner to have raised the claims in the lower state courts if the claims were not specifically presented to the state's highest court.

---

[26]Rec. Doc. No. 16.

*Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Furthermore, a petitioner does not fairly present a claim to the state's highest court if that court must read beyond the petition or brief, such as a lower court opinion, to find a claim not otherwise specifically raised. *Id*. at 32.

In this case, Scott's eighth claim was exhausted through his post-conviction review. The state court record demonstrates that Scott raised the issue of an incomplete record in his application for post-conviction relief, presenting the issue to each level of the state courts. Because, each court had the opportunity to consider the claim, claim number eight is considered to be exhausted, and the State's exhaustion defense as to claim number eight is rejected.

## V.    **Standards for a Merits Review**

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct, and the Court must give deference to the state court findings, unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable

application of clearly established federal law," as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485. The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, __ U.S. __, 134 S. Ct. 1697, 1706-07 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition, the rationale was not 'clearly established at the time of the state-court decision.'" *White*, 134 S. Ct. at 1706 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts. *White*, 134 S. Ct. at 1706-07; *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

In *Williams*, the Supreme Court did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *See Williams*, 529 U.S. at 410. The Court did, however, note that an unreasonable application of federal law is different from an incorrect application of federal law. *Id.* "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford*

*v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)). Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, but rather, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). Moreover, review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## VI.    Motion To Sever/Improper Joinder (Claim No. 1)

Scott contends that the Trial Court erred in denying his motion to sever the firearm and attempted murder charges. Scott alleges that the presentation of the evidence of his prior conviction for illegal use of a weapon amounted to impermissible "other crimes" evidence with respect to the other counts, serving only to confuse and prejudice the jury. Further, Scott alleges that the presentation misled the jury to a finding of guilt by implication, rendering the joinder of the claims impermissible. Scott claims that, under Louisiana law, he was entitled to the severance. In response, the State contends that Scott is not entitled to habeas corpus relief because he argues only violation of state law, but has failed to raise a constitutional issue.

Both Scott and Galle raised this claim on direct appeal to the Louisiana Fourth Circuit. The Court found that the offenses were properly joined under La. Code Crim. Proc. article 493 because they were based on the same act or transaction. It further found that the Trial Court had not abused its discretion in denying the motion to sever because Scott and Galle failed to demonstrate that the

joinder of the offenses for trial confounded their ability to present a defense.  This was the last reasoned decision, because the Louisiana Supreme Court denied Scott's subsequent writ application without stated reasons.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

As an initial matter, to the extent Scott argues that the Trial Court erred as a matter of state law in denying the severance, he has failed to state a cognizable federal claim.  A federal habeas court does not sit to correct errors made by state courts in interpreting and applying state law. *Swarthout v. Cooke*, __ U.S. __, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996)).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 67-68; *see also*, *Molo v. Johnson*, 207 F.3d 773, 776 n.9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law."); *Hogue v. Johnson*, 131 F.3d 466, 506 (1997) (a disagreement as to state law is not cognizable on federal habeas review).  The state courts' application and interpretation of Louisiana law on severance of offenses are not bases for federal habeas corpus relief.

Instead, federal habeas courts sit only to address violations of constitutional magnitude, including due process violations that render the criminal proceedings fundamentally unfair. *Lisenba v. People of the St. of Cal.*, 314 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937,

940 (5th Cir. 1991) (Habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right.")

Construing Scott's challenge to the denial of his request for a severance as a due process argument presents a mixed question of law and fact for this Court. *Manning v. Warden, Louisiana St. Penitentiary*, 786 F.2d 710, 711-12 (5th Cir. 1986) (failure of state court to sever counts presents a due process question of fundamental fairness on habeas review) (citing *Tifford v. Wainwright*, 588 F.2d 954, 957 (5th Cir. 1979) (denial of motion to sever codefendant's trial from that of other codefendants, under facts of the case, made trial "fundamentally unfair")).  Whether a petitioner's due process rights were violated is a question of law.  *Richardson v. Quarterman*, 537 F.3d 466, 472 (5th Cir. 2008).  This Court must determine if the state court's decision to deny the severance motion was contrary to, or involved an unreasonable application of, Supreme Court precedent concerning petitioner's due process rights.

It is settled that "[s]everance is within the discretion of the trial court and is required only in cases of compelling prejudice." *Breeland v. Blackburn*, 786 F.2d 1239, 1241 (5th Cir. 1986) (citing *United States v. MacIntosh*, 655 F.2d 80, 84 (5th Cir. 1981)).  For purposes of habeas review, simultaneous trial of more than one offense must have rendered the state trial fundamentally unfair before a petitioner can obtain federal habeas relief.  *Alvarez v. Wainwright*, 607 F.2d 683, 685 (5th Cir. 2003) (quoting *Triblett v. Wainwright*, 540 F.2d 840, 841 (5th Cir. 1976)).  "The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed by a reviewing court." *Breeland*, 786 F.2d at 1241 (citation omitted).

Louisiana law provides for the joinder of criminal acts in one bill of information or indictment under the following circumstances:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan, provided that the offenses joined must be triable by the same mode of trial.

La. Code Crim. Proc. art. 493.

In addition, La. Code Crim. P. art. 493.2 permits joinder of criminal charges based on sentencing exposure:

> [O]ffenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Louisiana law provides that the sentences for both second-degree attempted murder and felon in possession of a firearm can be served at hard labor.  La. Rev. Stat. § 14:30.1(B); La Rev. Stat. § 14:27(D)(3); La. Rev. Stat. § 14:95.1(B).

In Louisiana, "the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute."  La. Code Crim. Proc. art. 61.  The prosecutor's decision to join criminal charges in a bill of information is generally not subject to objection by the defense.  *See State v. Brooks*, 541 So. 2d 801, 810-11 (La. 1989) (citing La. Code Crim. Proc. art. 61 as providing broad discretion to the district attorney in determining whether to sever counts in an indictment); *State v. Burnett*, No. 2007-KA-2523, 2008 WL 2064975, at *3-*4 (La. App. 1st Cir. 2008) (unpublished) (finding that the district attorney has the discretion to prosecute offenses separately or in aggregate) (citing

*State v. Joles*, 492 So. 2d 490, 495 (La. 1986) (addressing joinder of theft counts)).  However, "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information, or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."  La. Code Crim. Proc. art. 495.1; *State v. Burks*, 905 So. 2d 394, 399 (La. App. 5th Cir. 2005).  A defendant claiming prejudice has a heavy burden to prove that severance of the charges is warranted.  *State v. Jones*, 33 So. 3d 306, 325 (La. App. 5th Cir. 2010) (citing *Burks*, 905 So. 2d at 399).

In Scott's case, the record discloses no requirement under state law that any count in the bill of indictment be severed and tried separately as a matter of Louisiana law.  Scott was charged with two counts of attempted second-degree murder and one count of felon in possession of a firearm, all of which were felonies appropriately brought in the same bill of indictment.  Scott does not challenge the fact that each of the charges against him were of the same character (felonies), arose from the same act or transaction, were triable by the same mode of trial, and could be charged in the same bill of indictment.  *See*, La. Code Crim. Proc. art. 782; *see also*, La. Rev. Stat. Ann. § 14:2 (A felony, under Louisiana law, "is any crime for which the offender may be sentenced to death or imprisonment at hard labor.").

Furthermore, under Louisiana law, "there is no prejudice and severance is not required if the facts of each offense are not complex, and there is little likelihood the jury will be confused by the evidence of more than one crime."  *State v. Lewis*, 557 So. 2d 980, 984 (La. App. 4th Cir. 1990). In determining whether joinder of two or more offenses would result in prejudice, the Louisiana courts consider the following factors:

> (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the

defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, considering the nature of the charges, the charging of several crimes would make the jury hostile.

*State v. Lewis*, 736 So. 2d 1004, 1015 (La. App. 4th Cir. 1999).

Scott has not established that the jury was impacted in any of the ways listed above. The trial transcript reflects that the State's presentation of the evidence and witnesses was organized in a manner that distinguished between the attempted murder and felon in possession of a firearm offenses. The facts of the offenses were not complex or confusing and were tied together through the common thread of Scott's possession of a firearm at the time of the shootings. There was no showing that the jury was unable to understand and evaluate the elements of each offense, inferred a criminal disposition, or was hostile as a result of the joinder of the offenses. In fact, the jury found Scott not guilty of the attempted murder of Williams. This verdict demonstrates that the jury was able to compartmentalize the evidence and assess each count independently. It also demonstrates that the jury was not hostile or prejudiced against Scott by the evidence of his prior conviction for five counts of illegal use of a weapon, and further, the prior conviction was not used by the jury to infer a criminal disposition.

The record is devoid of anything that might reflect the possibility that his trial was so fundamentally unfair that his due process rights were violated. Scott has failed to establish a due process violation arising from joinder of the offenses in the bill of indictment or at trial. The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court law. As such, Scott is not entitled to relief on this claim.

**VII.    <u>Sufficiency of the Evidence (Claim No. 2)</u>**

Scott contends that the evidence was insufficient to prove his identity to convict him of attempted second-degree murder of Nykeisha Jackson and of being a felon in possession of a firearm.  He argues that "the State failed to negate a reasonable possibility of mis-identification, whether intentional or due to [the victim's] medical, mental, and physical state[.]"[27]  In making this claim, Scott asserts Jackson's testimony was not credible.  Scott argues that, at the time of the incident, Jackson was high on crack, had been drinking, and was a drug dealer.  Scott also suggests that Jackson's injuries affected her memory and claims her testimony was uncorroborated and implausible and also conflicted with one of the 911 callers.  The State argues that the evidence that was presented at trial was sufficient to establish each element of the crimes charged and denial of relief by the state courts' was proper under federal law.

Scott raised the sufficiency of the evidence on direct appeal to the Louisiana Fourth Circuit. Relying on the standards set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), and related state law, the Court resolved that Scott's argument went to Jackson's credibility, which was exclusively a jury decision and that the evidence, when viewed in the light most favorable to the prosecution, was sufficient to establish that the defendant was guilty of the attempted second-degree murder of Jackson and possession of a firearm by a convicted felon.  This was the last reasoned opinion on the issue because the Louisiana Supreme Court denied relief without stated reasons.  *See Ylst*, 501 U.S. at 802.

Claims of insufficient evidence present a mixed question of law and fact.  *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995).  The Court must,

---

[27]Rec. Doc. 1, p. 33.

therefore, give deference to the state court's findings unless the decision was contrary to, or involved an unreasonable application of Supreme Court law. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

The appropriate standard for determining the sufficiency of evidence is that set forth in *Jackson*, relied on by the state appellate court, which requires a court to determine whether, after viewing the record and the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. 443 U.S. at 319; *Perez*, 529 F.3d at 594; *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir. 2011). Louisiana law allows for a crime to be proven by both direct and circumstantial evidence.

Under Louisiana law, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. § 15:438. However, on federal habeas corpus review, the court does not apply this "reasonable hypothesis" state law standard, but instead, must apply the *Jackson* and AEDPA standards of review. *Gilley v. Collins*, 968 F.2d 465, 468 (5th Cir. 1992) (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990)).

To the extent Scott relies on Louisiana's circumstantial evidence rule itself, "[t]his is not a purely separate test from the *Jackson* standard to be applied instead of a sufficiency of the evidence test . . . . Ultimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." *State v. Porretto*, 468 So. 2d 1142, 1146 (La. 1985); *accord State v. Williams*, 693 So. 2d 204, 209 (La. App. 4th Cir. 1997). The reasonable hypothesis standard under state law is "just an evidentiary guide for the jury. If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails."

*State v. Maxie*, 614 So. 2d 1318, 1321 (La. App. 3d Cir. 1993); *accord Williams*, 693 So. 2d at 209. As such, *Jackson* remains the appropriate standard for this Court on habeas review.

The Court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *See McDaniel v. Brown*, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court is to consider all of the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir. 2009) (quoting *Jackson*, 443 U.S. at 324) (*Jackson* standard relies "upon the record evidence adduced at the trial."). The review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (per curiam) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see also Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). A reviewing federal habeas court, therefore, is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses for that of the fact-finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (1995) (citing *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985)). All credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather, whether it made a rational decision to convict or acquit.'" *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U.S. at 324 n.16).

Scott was charged with, and convicted of, attempted second-degree murder and felon in possession of a firearm. Louisiana defines "attempt" in La. Rev. Stat. § 14:27:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

C. An attempt is a separate, but lesser, grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.

Second-degree murder is defined in relevant part by Louisiana law as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. Rev. Stat. § 14:30.1(A)(1). The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. § 14:10(1). Under Louisiana law, intent need not be proven directly, but may be inferred from the actions of the defendant and the circumstances surrounding those actions. *State v. Sharlhorne*, 554 So. 2d 1317, 1321 (La. App. 1st Cir. 1989); *State v. Tate*, 851 So. 2d 921, 930 (La. 2003) (citing *State v. Brooks*, 505 So. 2d 714, 717 (La. 1987)).

Louisiana law also provides that specific intent to inflict great bodily harm alone is not enough to support a conviction for attempted second-degree murder. *State v. Butler*, 322 So. 2d 189, 193 (La. 1975); *State v. Collins*, 43 So. 3d 244, 251 (La. App. 1st Cir. 2010) ("To be guilty of attempted second-degree murder, a defendant must have the specific intent to kill and not merely the specific intent to

inflict great bodily harm.").  Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun.  *Id.* (citing *State v. Brunet*, 674 So. 2d 344, 349 (La. 1996)).

Moreover, in Louisiana, the offense of being a previously convicted felon in possession of a weapon is defined as follows: "It is unlawful for any person who has been convicted of . . . any violation of the Uniform Controlled Dangerous Substances law, which is a felony . . . to possess a firearm or carry a concealed weapon."  La. Rev. Stat. § 14:95.1(A).  To sustain a conviction for possession of a firearm by a convicted felon, the State had to prove the following elements of the offense: (1) possession of a firearm, (2) prior conviction for an enumerated felony, (3) absence of the ten-year statutory limitation period, and (4) the general intent to commit the crime.  *State v. Caffrey*, 15 So. 3d 198, 202 (La. App. 5th Cir. 2009); *State v. Ray*, 961 So. 2d 607, 610 (La. App. 2d Cir. 2007); *State v. Robert*, 956 So. 2d 750, 754 (La. App. 2d Cir. 2007).

Specific intent is not necessary to convict for the offense of a previously convicted felon in possession of a firearm.  Instead, general intent is all that is required, and it may be proved through either the actual or constructive possession of a firearm.  *State v. Law*, 46 So. 3d 764, 770 (La. App. 2d Cir. 2010); *State v. Jamerson*, 1 So. 3d 827, 831 (La. App. 2d Cir.2009).  General intent may be inferred from the circumstance of the transaction and proved by direct or circumstantial evidence.  *State v. Brokenberry*, 942 So. 2d 1209, 1213 (La. App. 2d Cir. 2006); *State v. Culp*, 17 So. 3d 429, 435 (La. App. 2d Cir. 2009).  Determination of whether the requisite intent is present in a criminal case is for the trier of fact.  *State v. Brown*, 92 So. 3d 579, 585 (La. App. 2d Cir. 2012) (citing *State v. Huizar*, 414 So. 2d 741 (La. 1982)).

Scott does not specifically contest the sufficiency of the proof related to the essential statutory elements of the offenses for which he was convicted, but rather, challenges the sufficiency of the evidence to prove his identification as a perpetrator of the crimes.  Under Louisiana law, in addition to

proving the statutory elements of the charged offense at trial, the State is required to prove a defendant's identity as a perpetrator. *State v. Draughn*, 950 So. 2d 583, 593 (La. 2007), *cert. denied*, 552 U.S. 1012 (2007); *State v. Thomas*, 192 So. 3d 291, 303 (La. App. 5th Cir. 2016); *State v. Ingram*, 888 So. 2d 923, 926 (La. App. 5th Cir. 2004). Where the key issue is identification, the State is required to negate any reasonable probability of misidentification. *Id.* However, a positive identification by only one witness is sufficient to support a conviction. *State v. Williams*, 3 So. 3d 526, 529 (La. App. 5th Cir. 2008). A positive identification by a victim, as well as the victim's testimony alone, also is sufficient identification evidence regarding the crime committed against that victim. *Holderfield v. Jones*, 903 F. Supp. 1011, 1017 (E.D. La. 1995) (citing *State v. Turner*, 591 So. 2d 391 (La. App. 2d Cir. 1991)).

A review of the relevant evidence presented at trial was more than sufficient to establish, and Scott does not contest, that Jackson was shot four times. Neither Galle nor Scott were strangers to Jackson. The jury heard testimony from Jackson that Galle and Scott came to her home on the morning of the incident.[28] She testified that she had known Galle about seven or eight months and that Scott was with Galle 85% of the time she saw Galle.[29] Jackson had been to Scott's Willowbrook apartment a few times and had met his girlfriend.[30] Jackson testified that Galle took a handgun from his waist and gave it to Scott and told him to "Lay the bitch down."[31] Scott then shot her in the head.[32] When Galle realized Jackson wasn't dead, he told Scott to "shoot her again."' Scott then shot Jackson three

---

[28]St. Rec. Vol. 7 of 10, Trial Transcript, p. 344, 3/16/11.

[29]*Id.*, at pp. 345, 370, 371.

[30]*Id.* at pp. 311, 345.

[31]*Id.* at pp. 347, 368.

[32]*Id.*, at p. 347.

more times in the chest, stomach, and knee.[33]  When Jackson was released from the hospital, she met

with Detective McGhee and told him that Galle told Scott to shoot her.[34]  Although Jackson did not

know Scott's name at that time, she told McGhee that she could identify him.[35]  In July 2009, Jackson

went with McGhee to Willowbrook Apartments and pointed out the apartment where Scott lived with

his girlfriend.[36]  Jackson, without a doubt, identified Scott from a lineup as the person who shot her.[37]

Furthermore, Jackson never altered her identification of Scott as the shooter.  Thus, the

evidence before the jury was sufficient to establish that Scott was present at Jackson's home and was

identified as one of the perpetrators, specifically, the person who shot Jackson four times. *Preacher v.*

*Estelle*, 626 F.2d 1222, 1225 (5th Cir. 1980) (identification evidence sufficient where victim, who

never identified anyone else as the perpetrator, positively identified defendant at the trial, gave the

basis upon which she made the identification, and was subject to cross-examination); *Holderfield*, 903

F. Supp. at 1017 (a victim's positive identification constitutes sufficient identification evidence).

Additionally, the jury obviously found Jackson's testimony and statements, including those

identifying Scott as the shooter, to be credible.  *Jackson* limits this Court's review to the evidence

before the trier of fact and does not allow the Court to reassess the weight and credibility of the

evidence.  *See Jackson*, 443 U.S. at 319 (finding that such matters are left to the factfinder).

Specifically, the determination of the credibility of a witness is within the province of the jury and is

not to be disturbed on habeas review.  *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (that

---

[33]*Id.*, at p. 348.

[34]*Id.*, at pp. 356, 368.

[35]*Id.*, at pp. 285, 312 (Detective McGhee), 356, 368 (Jackson).

[36]*Id.*, at pp. 285-286, 323 (Detective McGhee), 358 (Jackson).

[37]*Id.*, at pp. 288, 327 (Detective McGhee), 359 (Jackson).

the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions); *Holderfield*, 903 F. Supp. at 1018 (citing *United States v. Hatch*, 926 F.2d 387, 399 (5th Cir. 1991)) (The habeas court should defer to the jury's resolution of credibility determinations and justifiable inferences of fact.). As such, he jury's resolve was reasonable and supported by the evidence and testimony.

For these reasons, Scott has failed to establish that the verdict was contrary to the law and evidence or that there was insufficient evidence under the *Jackson* standard to support the verdict against him. The state courts' denial of relief on these issues was not contrary to, or an unreasonable application of, Supreme Court law. Therefore, Scott is not entitled to relief on these claims.

## VIII. <u>Non-unanimous Verdict (Claim No. 3)</u>

In addition, Scott contends the Trial Court erred in failing to instruct the jury on a unanimous verdict being required, challenging the constitutionality of the Louisiana non-unanimous jury rule. In response, the State argues that this claim is not cognizable on habeas review.

As previously indicated, Scott, through counsel, filed a motion to declare La. Code Crim. Proc. art 872 and La. Const. art.1, § 17 unconstitutional, as they authorize non-unanimous verdicts. Both Galle and Scott raised the issue on appeal, contending that the practice violates their rights under the Fourteenth Amendment. The Louisiana Fourth Circuit found the claim had no merit. This was the last reasoned opinion on the issue. *See Ylst*, 501 U.S. at 802

This kind of challenge to the constitutionality of state law presents a pure question of law. *Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007). Thus, Scott may obtain federal habeas

corpus relief as to this kind of claim only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent.

The decades-old and clearly established United States Supreme Court precedent applicable to this claim is directly contrary to Scott's argument. In *Apodaca v. Oregon*, 406 U.S. 404 (1972), and *Johnson v. Louisiana*, 406 U.S. 356 (1972), the United States Supreme Court upheld the constitutionality of state laws – including Louisiana's – that permitted criminal defendants to be convicted by less than unanimous votes. While the Supreme Court itself has recently described the *Apodaca/Johnson* holding as "the result of an unusual division among the Justices," it also made clear, in the same breath, that *Apodaca/Johnson* remains the law of the land: "The [Supreme] Court has held that, although the Sixth Amendment right to trial by jury requires a unanimous verdict in federal criminal trials, it does not require a unanimous verdict in state criminal trials." (citations omitted, emphasis added); *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3035 n. 14 (2010).

In the habeas corpus context, the Fifth Circuit has recognized that a prisoner's constitutional challenge to a state court conviction by a non-unanimous jury must be rejected under *Apodaca/Johnson*: "We first note that we cannot find, as petitioner would like, that the state court violated any federal right to a unanimous verdict in state court, because the Supreme Court 'has not held that the Constitution imposes a jury unanimity requirement.'" *Hoover v. Johnson*, 193 F.3d 366, 369 (5th Cir. 1999) (quoting *Richardson v. United States*, 526 U.S. 813, 119 S. Ct. 1707, 1712 (1999) and citing *Johnson*, 406 U.S. at 366) (emphasis added).

Scott effectively concedes, in his own written submissions, that the clearly established precedent in *Apodaca* and *Johnson* is contrary to his position. Scott seeks change in the law, but

does not demonstrate contrary or unreasonable application of clearly established Supreme Court precedent in his case. Simply stated, Scott asks this Court to reconsider the Supreme Court's holdings in *Apodaca* and *Johnson*. On federal habeas corpus review, however, it is not the function of this Court to reassess the law pronounced by the Supreme Court. That is not the role of this Court under the AEDPA. *See White*, 134 S. Ct. at 1706. Instead, the standard to be applied is whether the state courts' decisions to uphold the trial court's denial of Scott's motion seeking a unanimous verdict and Scott's conviction based on a non-unanimous jury verdict was contrary to or involved an unreasonable application of *clearly established* United States Supreme Court precedent. Under *Apodaca* and *Johnson* and its progeny, including the decisions cited above, the state courts' decisions in this regard were wholly consistent with Supreme Court precedent, and Scott is not entitled to federal habeas corpus relief on this claim.

## IX.     Overruling of *Batson* Challenges (Claim No. 5)

Scott contends that he was denied the right to a fair and impartial jury. He argues that the prosecution impermissibly used peremptory challenges to remove several African-American persons from the venire in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). In response, the State argues that Scott fails to make a prima facie showing of discrimination.

Scott raised this claim in his application for post-conviction relief. However, the Trial Court found the claim to be without merit because, "for every peremptory challenge, the State was able to present race and gender-neutral reasons for striking the juror(s)."[38] The Fourth Circuit

---

[38]St. Rec. Vol. 2 of 10, Trial Court Order, p. 2, 4/17/15.

found no error in the Trial Court's judgment denying relief.[39]  Affirming the Fourth Circuit, the

Louisiana Supreme Court found Scott failed to satisfy his post-conviction burden of proof.[40]

In *Batson*, the Supreme Court held that purposeful racial discrimination in the use of

peremptory strikes of prospective jurors violates the Equal Protection Clause. 476 U.S. at 89.  The

United States Supreme Court has outlined the following to address a *Batson* challenge:

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry.
> First, the trial court must determine whether the defendant has made a prima facie
> showing that the prosecutor exercised a peremptory challenge on the basis of race.
> 476 U.S. at 96-97, 106 S. Ct. 1712.  Second, if the showing is made, the burden
> shifts to the prosecutor to present a race-neutral explanation for striking the juror in
> question.  *Id.*, at 97-98, 106 S. Ct. 1712.  Although the prosecutor must present a
> comprehensible reason, "[t]he second step of this process does not demand an
> explanation that is persuasive, or even plausible;" so long as the reason is not
> inherently discriminatory, it suffices.  *Purkett v. Elem*, 514 U.S. 765, 767-768, 115
> S. Ct. 1769, 131 L. Ed.2d 834 (1995) (per curiam).  Third, the court must then
> determine whether the defendant has carried his burden of proving purposeful
> discrimination.  *Batson*, *supra*, at 98, 106 S. Ct. 1712; *Miller-El v. Dretke*, 545 U.S.
> [231, 251-52], 125 S.Ct. 2317, 2331-32, 162 L. Ed.2d 196 (2005).  This final step
> involves evaluating "the persuasiveness of the justification" proffered by the
> prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests
> with, and never shifts from, the opponent of the strike." *Purkett*, *supra*, at 768, 115
> S.Ct. 1769.

*Rice v. Collins*, 546 U.S. 333, 338 (2006); *accord Stevens v. Epps*, 618 F.3d 489, 492 (5th

Cir. 2010).

Accordingly, to establish a prima facie case, the petitioner must show a

combination of the following factors: (1) the prosecutor's challenge was directed at a

member of a defendant's cognizable racial group; (2) the challenge was peremptory rather

than for cause; and (3) sufficient circumstances raise an inference that the prosecutor used

---

[39]St. Rec. Vol. 8 of 10, 4th Cir. Order, 2015-K-0558, 6/17/15.

[40]*State ex rel. Scott v. State*, 201 So. 3d 252 (La. 2016) (per curiam); St. Rec. Vol. 10 of 10, La. Supreme
Court Order, 2015-KH-1321, 9/16/16.

peremptory strikes to exclude the venire person because of race.  *Batson*, 476 U.S. at 96

(citations omitted).  As the United States Fifth Circuit recently made clear, unless this

prima facie showing is made, there is no need for the court to consider the final two steps:

> The Supreme Court and this court have both granted writs based on findings
> that state courts had made unreasonable factual determinations in rejecting
> *Batson* claims.  *Miller-El II*, 545 U.S. at 266, 125 S. Ct. 2317; *Reed [v.
> Quarterman]*, 555 F.3d [364,] 382 [5th Cir. 2009].  In doing so, those cases
> relied heavily on comparative juror analysis.  That analysis comes into play
> in the final stage of the *Batson* inquiry for determining whether a prosecutor
> used a peremptory strike in a racially discriminatory manner.  Before that
> point, the defendant must have first made a prima facie showing that the
> prosecutor exercised peremptory challenges on the basis of race; in
> response, the prosecutor must have articulated a race-neutral reason for
> striking the juror in question.  *Batson*, 476 U.S. at 96-98, 106 S. Ct. 1712.
> That requires the court to then make the ultimate determination whether the
> defendant carried her burden of proving purposeful discrimination.  *Batson*,
> 476 U.S. at 96-98, 106 S. Ct. 1712; *see Purkett v. Elem*, 514 U.S. 765, 768,
> 115 S.Ct. 1769, 131 L. Ed. 2d 834 (1995).

*Chamberlin v. Fisher*, 855 F.3d 657, 663-64 (5th Cir. 2017), *reh'g en banc granted*, ___

F.3d ____ (5th Cir. July 10, 2017).

Once the court reaches the final stage of determining whether purposeful

discrimination has occurred, "the defendant may rely on all relevant circumstances to raise

an inference of purposeful discrimination."  *Fields v. Thaler*, 588 F.3d 270, 274 (5th Cir.

2009) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotations omitted).

*Batson* noted that circumstances to be considered when ultimately deciding purposeful

discrimination include a "pattern" of strikes against jurors and the nature of the questions

and statements by the prosecutor during voir dire. 476 U.S. at 96-97.  Considerations

enumerated by other federal courts include (1) the percentage of similar panelists

challenged by the prosecutor with a peremptory strike, (2) comparison of stricken panelists

to white panelists allowed to serve, (3) the prosecutor's use of procedural mechanisms to

move particular jurors to the back of the panel, where they are less likely to be selected, (4) evidence of contrast between questions posed to black and non-black panelists, indicating intent to load questions to make a case to exclude the black panelists, and (5) evidence of a systematic policy or practice within the prosecutor's office of excluding minority jurors. *United States v. Nelson*, 450 F.3d 1201, 1207-08 (10th Cir. 2006) (citing *Miller-El*, 545 U.S. at 231).

The neutrality issue under the second step of *Batson* and the ultimate question of discriminatory intent under the third step are questions of fact. *Hernandez v. New York*, 500 U.S. 352, 364, 369 (1991); *accord Rice*, 546 U.S. at 338-42; *Moody v. Quarterman*, 476 F.3d 260, 267(5th Cir. 2007) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). The Supreme Court has noted that during jury selection, the entire *res gestae* takes place in front of the trial judge, leaving the judge well situated to detect the true purpose of the peremptory challenge. *United States v. Armstrong*, 517 U.S. 456, 468 (1996). The Fifth Circuit has held that the reasoning may be "stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated." *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993). A "judge is free, based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race." *Id.* The state court's answer to "'the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal,'" because such a finding largely turns on the court's "evaluation of the prosecutor's credibility." *United States v. Sneed*, 34 F.3d 1570, 1579 (10th Cir. 1994) (quoting *Hernandez*, 500 U.S. at 364); *accord Rice*, 546 U.S. at 338–42; *Moody*, 476 F.3d at 267 (citing *Purkett*, 514 U.S. at 768).

The Supreme Court has emphasized that, pursuant to Section 2254(e), state court factual findings must be presumed correct, unless the federal court finds that "the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003). If convincing evidence establishes that the factual determination was unreasonable, the federal habeas court's focus must be on the third step of the *Batson* test. *Rice*, 546 U.S. at 342; *Moody*, 476 F.3d at 266. At that step, "we presume [the state] court's factual findings to be sound unless [petitioner] rebuts the 'presumption of correctness by clear and convincing evidence.' § 2254(e)(1)." *Miller-El*, 545 U.S. at 240; *Moody*, 476 F.3d at 267.

The record indicates that Scott is African–American and that the prosecution used peremptory challenges to exclude some African–Americans from the jury. The Trial Court, however, determined that the State had provided race-neutral reasons for challenging each of the six persons and had not violated *Batson*. As will be discussed, the record does not contain any circumstance that would undermine this finding.

In this case, voir dire was conducted in three groups, two groups of twenty (20) panelists and one group of twenty-five (25) panelists. The record does not contain an official designation of the races of the potential jurors. Further, the trial transcript does not contain a copy of the voir dire examination. However, the trial transcript indicates that voir dire examination was conducted with no objections being lodged to the first and second panels and one objection by the State to a line of questioning posed by Scott's counsel to a prospective juror in the third panel.[41]

---

[41]St. Rec. Vol. 5 of 10, Trial Transcript, pp. 36, 46, 59-60, 3/14/11.

One panelist from the first panel was excused by consent.[42]   The State used five of its eighteen (18) peremptory challenges to exclude five prospective jurors from the first panel, four who were also challenged by either Scott or Galle.[43]   Galle and Scott each used five of their 12 peremptory challenges.[44]

At the end of the selection of the second panel, Galle and Scott collectively used another 10 peremptory challenges.[45]   The State used six peremptory challenges to exclude six panelists. After the State's sixth challenge, Scott's counsel raised a *Batson* challenge, noting that all panelists the State struck on the second panel were African-American.[46]   The State responded that, "If you look at both panels, they haven't been."[47]   After determining that each of the six challenged panelists were African-American, the Trial Court required that the prosecutor provide reasons for the peremptory challenges.[48]

The prosecutor stated that she struck Marie Pierre because "she answered exactly one question posed by the State, even though there were several questions posed to her.  Ah, she did not speak."[49]   The prosecutor further explained that Ms. Pierre did not give verbal answers to the

---

[42]St. Rec. Vol. 2 of 10, Voir Dire Judge's List, p. 1 of 4.

[43]*Id.*

[44]*Id.*

[45]*Id.*

[46]St. Rec. Vol. 5 of 10, Trial Transcript, p. 54, 3/14/11.

[47]*Id.*

[48]*Id.*, at pp. 54-55.

[49]*Id.*, at p. 55.

questions posed but rather nodded or shook her head in response.[50]  In addition, the prosecution

excluded Madeline Coleman, who was also challenged by defendant Galle, because she previously

served on a criminal jury where the defendant was found not guilty.[51]  The prosecutor indicated

that she excluded Odelia Condiff because she was non-responsive and did not interact with the

prosecutor's co-counsel during voir dire.[52]  As for Willie Williams, who had previously informed

the court that he had to work and that there was no one to replace him, the prosecutor felt that he

was glaring throughout voir dire.[53]  As further explanation, the prosecutor noted that Williams

gave only one verbal response and either grunted or shook his head in response to the remaining

questions.[54]  With regards to Daryl Jones, the prosecutor said she excused him because he had

previously served on a jury where the defendant was found not guilty of armed robbery.[55]  Finally,

she explained that she excluded Earl Haywood because he did not verbally respond to several

questions posed directly to him.[56]

The Trial Court resolved that the peremptory challenges were race-neutral based on the

State's representations, and found that the State had not violated *Batson*.[57]  Thereafter, defense

counsel did not argue that prosecutor's reasons were pretextual or present any evidence rebutting

---

[50]*Id.*, at pp. 55-56.

[51]*Id.*, at p. 56.

[52]*Id.*

[53]*Id.*

[54]*Id.*, at pp. 50, 56.

[55]*Id.*, pp. 56-57.

[56]*Id.*, at p. 56.

[57]*Id.*, at p. 57.

the prosecution's explanations for the strikes, but counsel simply asked that her objections be noted for the record.[58]

The Trial Court allowed the State to put forth its race-neutral reasons for exercising each of its peremptory challenges, subject to defense objection.  The State posed logical reasons for excluding each prospective juror and each of those reasons was found to be race-neutral.  Scott has offered no persuasive rebuttal to the state court's finding of neutrality.  The law requires that Scott ultimately do more than just object to the reason offered or to the Trial Court's finding of neutrality.  Instead, Scott must rebut the presumption of correctness by clear and convincing evidence in order to show purposeful discrimination.  *Cockrell*, 537 U.S. at 240, 251-52.  Scott has not offered to this Court any evidence, much less clear and convincing evidence, to establish that the findings by the Trial Court were unreasonable, or not supported by the record, in such a manner as to overcome the presumption of correctness under the AEDPA.  *Id.*  The Trial Court was entitled to its credibility determination regarding the prosecutor's stated neutral reasons for exercising peremptory challenges to these jurors, and must be given great deference in judging the credibility of the prosecutor.  *Hernandez*, 500 U.S. at 364.

It is the Court's determination that the state courts' denial of relief on this claim was not contrary to or an unreasonable application of *Batson*.  As such, Scott is not entitled to relief on this claim.

---

[58]St. Rec. Vol. 5 of 10, Trial Transcript, p. 57, 3/14/11.

**X**.    **Erroneous Jury Instruction (Claim No. 6)**

Moreover, Scott alleges that the Trial Court erred in instructing the jury on the definition of attempted second degree murder by including "or inflict bodily harm."  He argues, under Louisiana law, a verdict cannot be based on an intent to inflict great bodily harm.  In response, the State argues that the Trial Court properly instructed the jury.

Scott also raised this issue in his motion for post-conviction relief.  The Trial Court found that "or inflict bodily harm" is within the definition of second-degree murder and was properly read to the jury.[59]  The Fourth Circuit found no error in the ruling,[60]  and the Louisiana Supreme Court found Scott failed to satisfy his post-conviction burden of proof.[61]

In order to determine whether the language of a jury charge amounts to a constitutional error, the Court must determine whether the instructions, when read as a whole, relieved the State of its burden to prove each element of the crime beyond a reasonable doubt, which is in violation of the principles set forth in *In re Winship*, 397 U.S. 358 (1970).  *See Francis v. Franklin*, 471 U.S. 307 (1985).  In doing so, the Court must consider whether the specific language involved creates a constitutionally objectionable "mandatory presumption" or "merely a permissive inference" on an essential element of the crime.  *Franklin*, 471 U.S. at 314.

---

[59]St. Rec. Vol. 5 of 10, Trial Court Order, p. 3, 4/29/15.  While the issue was subject to procedural bar on collateral review because Scott's counsel failed to raise the issue on appeal, the Trial Court did not apply the bar and instead addressed the issue on the merits.

[60]St. Rec. Vol. 8 of 10, 4th Cir. Order, 2015-K-0558, 6/17/15.

[61]*State ex rel. Scott v. State*, 201 So. 3d 252 (2016) (per curiam); St. Rec. Vol. 10 of 10, La. S. Ct. Order, 2015-KH-1321, 9/16/16.

The mere use of an erroneous instruction to the jury is not a basis for federal habeas relief. *Estelle*, 502 U.S. at 62. Instead, the Court must focus on "whether the ailing instruction, by itself, so infected the entire trial process that the resulting conviction violates due process." *Id*. at 72 (citations omitted). In examining the challenged instruction, the Court does not look at it in "artificial isolation," but must consider it in the "context of the instructions as a whole and the trial record." *Id*. Finally, when there is a question as to whether a jury instruction is ambiguous and violates due process by relieving the State of the burden of proof of an element of a crime, the question before the Court is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id*. (citations omitted); *accord Flowers v. Blackburn*, 779 F.2d 1115 (5th Cir. 1986).

If the charge amounts to error, the Supreme Court has held that the error is subject to a harmless error analysis, finding jury charge challenges to be trial error and not structural error. *California v. Roy*, 519 U.S. 2, 5–6 (1996) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L. Ed. 1557 (1946)). There must be something more than a "mere reasonable possibility" that the error contributed to the verdict. *Woods v. Johnson*, 75 F.3d 1017, 1026–27 (5th Cir.1996). The applicable test is whether the instruction "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *Roy*, 519 U.S. at 6; *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). According to the Fifth Circuit, "if our minds are 'in virtual equipoise as to the harmlessness' under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Robertson v. Cain,* 324 F.3d 297, 304 (5th Cir. 2003) (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026–27 (5th Cir. 1996) (quoting *O'Neal*, 513 U.S. at 435)).

Upon application, when a federal judge in a habeas proceeding is in grave doubt about whether trial error of a federal constitutional law had substantial and injurious effect or influence in determining a jury's verdict, that error is not harmless, and petitioner must be granted relief. *O'Neal*, 513 U.S. at 436. Therefore, this Court on habeas review is required first to determine whether the instructions given at trial amounted to constitutional error and, if so, whether the error was harmless. The burden of proof is on the petitioner to prove both the error and the constitutional violation. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). A habeas petitioner bears a particularly heavy burden to establish that the allegedly improper instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

During deliberations, the jury sent a note requesting the written instructions for second-degree murder, attempted manslaughter, aggravated battery, possession of a firearm by a convicted felon and attempted possession of a firearm by a convicted felon.[62] The Trial Court explained that it could not permit the jury to take written instructions into the deliberation room, but could read the relevant portions of the instructions again.[63] The Trial Court instructed the jury, in relevant part:[64]

> The defendants are each charged with two counts of attempted second-degree murder. There are four verdicts responsive to this charge: Guilty or guilty [sic] of attempted manslaughter or guilty of aggravated battery or nor guilty.

---

[62]St. Rec. Vol. 1 of 10, Jury Questions (undated); St. Rec. Vol. 7 of 10, Trial Transcript, pp. 429-430, 3/16/11.

[63]St. Rec. Vol. 7 of 10, Trial Transcript, p. 430, 3/16/11.

[64]*Id.*, at p. 431.

> Second-degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.
>
> I know I've gone over attempt with you, but I'm gonna do it again.  An attempt takes place when an offender, with the specific intent to commit a certain crime, does or omits some action designed to accomplish his intention.  So if you find, one, that the defendants had a specific intent to commit the crime of second-degree murder of Nikeysha Jackson and/or Thomas Williams and, two, that the defendants did or omitted an act for the purpose of and tending directly toward the commission of the crime of second-degree murder and that this took place in the Parish of Orleans on or about the date specified in the Bill of Indictment, then you shall find the defendants guilty of attempted second-degree murder.

Under Louisiana law, the instruction provided is an accurate definition of second-degree murder.  Scott contends, however, that the Trial Court did not explain that intent to commit great bodily harm was not sufficient to prove attempted second-degree murder under state law.

Under Louisiana law, it has long been resolved that, while intent to inflict great bodily harm is an element of second-degree murder, it is not to be considered in obtaining a conviction for attempted second-degree murder.  *State v. Butler*, 322 So. 2d 189 (La. 1975).  As the charge included a reference to the intent to inflict great bodily harm and failed to instruct that Scott needed to have the "specific intent to kill" to be found guilty of attempted second-degree murder, the charge was erroneous and constitutionally deficient.  *Harris v. Warden, La. State Penitentiary*, 152 F.3d 430, 438 (5th Cir. 1998) (attempted second-degree murder instruction was constitutionally deficient where "[t]he court provided the jury with the statutory definition of murder, which states that the defendant must either intend to kill or inflict great bodily harm, and then stated that in order to convict the defendant of attempted murder they must find that the defendant had the "specific intent to commit [murder]".)  Scott, however, has not established a "grave doubt" in the mind of this Court that the error was harmless.

In this case, the jury heard the testimony and received evidence that Scott shot Jackson four times, demonstrating, under Louisiana law, a specific intent to kill. *State v. Hurst*, 214 So. 3d 174, 180 (La. App. 2d Cir. 2017) ("The fact that multiple shots are fired at a victim indicates a defendant's culpable state of mind and satisfies the specific intent to kill") (citing *State v. Griffin*, 618 So. 2d 680 (La. App. 2d Cir. 1993), *writ denied*, 625 So. 2d 1063 (La. 1993)); *State v. Walter*, 144 So. 3d 1134 (La. App. 2d Cir. 2014) (specific intent to kill was demonstrated by defendant deliberately pointing gun at victim and firing it five times), *writ denied*, 161 So. 3d 14 (La. 2015).

Furthermore, the jury heard testimony from Jackson that Galle told Scott to "Lay the bitch down," which Jackson thought meant to kill her.[65]  According to Jackson, when Galle realized Jackson was still alive after Scott shot her in the head, he told Scott, "The bitch not dead.  Man, this bitch ain't dead.  Shoot her again."[66]  Scott then proceeded to shoot Jackson three more times in the chest, stomach, and knee.[67]  Detective McGhee testified that Jackson was near death when he arrived at the scene.[68]  Jackson testified that she almost died as a result of her injuries and that she was in a coma for several days.[69]  As a result, the jury's decision to give credit to that testimony must be respected.

Finally, Scott did not present a defense at trial that he did not have the requisite intent to kill.  Rather, his defense was that of mistaken identity.

---

[65] St. Rec. Vol. 7 of 10, Trial Transcript, pp. 347, 365, 3/16/11.

[66] *Id*. at p. 348.

[67] *Id*. at, p. 348.

[68] *Id*., at p. 265.

[69] *Id*., at pp. 353, 355, 366.

Based on the evidence presented at trial, it cannot be said that the reference to great bodily harm by the Trial Court had a substantial and injurious effect or influence in determining the jury's verdict. The testimony at trial established that Galle told Scott to "Lay that bitch down" and that Scott initially shot Jackson once in the head, and then shot her another three times after Galle, voicing that Jackson was not dead, told Scott to shoot her again. Thus, the erroneous jury instruction was harmless under *Brecht*.

The state courts' ruling was not contrary to, or an unreasonable application of, Supreme Court law. Consequently, Scott is not entitled to relief on this claim.

## XI.    <u>Ineffective Assistance of Counsel (Claim Nos. 4, 6, 7)</u>

Scott also alleges that he received ineffective assistance of counsel. He claims his trial counsel denied him of the right to testify and failed to object to the jury instruction relating to attempted second-degree murder. Further, Scott claims his appellate counsel failed to appeal the *Batson* issue.

Scott asserted these arguments in his state application for post-conviction relief. Upon its review, pursuant to the standards set forth in *Strickland*, 466 U.S. at 668 and related state case law, the Trial Court found Scott's claims to be without merit. The Trial Court, in addressing the claim that counsel failed to let him testify, found that Scott failed the second prong of the *Strickland* requirements.[70] Regarding Scott's claim that his counsel was ineffective for failing to object to the jury instruction, the Trial Court did not specifically address this, but found that the instruction was proper.[71]

---

[70]St. Rec. Vol. 5 of 10, Trial Court Order, pp. 1-2, 4/29/15.

[71]*Id.*, at p. 3.

The Trial Court found that Scott's ineffective assistance of claim relating to the failure of appellate counsel to raise the *Batson* issue on appeal was not a basis for post-conviction relief.[72] The Louisiana Fourth Circuit found no error in the Trial Court's ruling.[73]  In the last reasoned opinion, the Louisiana Supreme Court concluded that Scott failed to demonstrate that he received ineffective assistance of counsel at trial under the *Strickland* standards.[74]

The issue of ineffective assistance of counsel is a mixed question of law and fact.  *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010). The question for this Court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.

In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom.  *Strickland*, 466 U.S. at 687.  The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence.  *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992).  In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

---

[72]*Id.*, at p. 2.

[73]St. Rec. Vol. 8 of 10, 4th Cir. Order, 2015-K-0558, 6/17/15.

[74]*State ex rel. Scott v. State*, 201 So. 3d 252 (La. 2016) (per curiam); St. Rec. Vol. 10 of 10, La. S. Ct. Order, 2015-KH-1321, 9/16/16.

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The Court's analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See id.* at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Harrington*, 562 U.S. at 104 (citing *Strickland,* 466 U.S. at 689). "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell*, 535 U.S. at 702 (citing *Strickland*, 466 U.S. at 689). As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland*, 466 U.S. at 689; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v.*

*Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 562 U.S. at 112. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller*, 200 F.3d at 282 (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (citing *Strickland*, 466 U.S. at 690). The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) therefore is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009)). This Court

must, therefore, apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690; *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999).

Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner. *Strickland*, 466 U.S. at 689; *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008); *Moore*, 194 F.3d at 591.  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Neal*, 286 F.3d at 236–37; *Clark v. Johnson*, 227 F.3d 273, 282–83 (5th Cir. 2000).  Tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance.  *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) and *Mann v. Scott*, 41 F.3d 968, 983–84 (5th Cir. 1994)).

The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *Duhmel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992) (citing *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991)).  In reviewing claims of ineffective assistance of appellate counsel, the Supreme Court has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the [ ] defendant.  *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).  When alleging ineffective assistance of appellate counsel, the defendant "must show that the neglected claim would have had a reasonable probability of success on appeal."  *Duhmel*, 955 F.2d at 967. However, failing to raise every meritorious claim on appeal does not make counsel deficient. *Green v. Johnson*, 116 F.3d 1115, 1125-26 (5th Cir. 1997) (citing *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989)).  Similarly, failing to raise a frivolous claim "does not cause counsel's

performance to fall below an objective level of reasonableness." *Id*. at 1037. Courts give great deference to professional appellate strategy and applauds counsel for "winnowing out weaker arguments on appeal and focusing on one central issue, if possible, and, at most, a few key issues . . . ." *Jones v. Barnes*, 463 U.S. 745, 752 (1983). This is true even where the weaker arguments have merit. *Id*. at 751–52. Instead, the applicable test is whether the omitted issue was "clearly stronger" than the issue[s] actually presented on appeal. *See; e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000).

In the instant case, Scott fails to establish that his counsel's performance was objectively unreasonable or deficient under the circumstances of his case or that there is a reasonable probability that, but for his counsel's actions, the result of the proceedings would have been different.

### A.    <u>Right to Testify (Claim No. 4)</u>

Scott claims that his counsel refused to allow him to testify in his own defense and failed to advise Scott that it was his decision to make. He notes that the Trial Court failed to conduct a colloquy, advising him of the right to testify and assuring the waiver of that right was knowing. Scott claims that, had he been permitted to testify, he would have testified that he was not present at the scene of the crime or in its vicinity and that he did not know about the crime. The State responds that Scott's claim is unsubstantiated and the state courts' rejection of the claim is consistent with clearly established federal law.

It is well settled that a criminal defendant has the right to testify on his own behalf pursuant to the Fifth, Sixth and Fourteenth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 44, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); *Bower v. Quarterman*, 497 F.3d 459, 473 (5th Cir. 2007); *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001); *Jordan v. Hargett*, 34 F.3d 310, 312 (5th Cir. 1994).

A defendant can only waive his right to testify if that waiver is knowing, intelligent and voluntary. *Bower*, 497 F.3d at 473 (citing *Emery*, 139 F.3d at 198). A violation of this right occurs only if the "'final decision that [the defendant] would not testify was made against his will.'" *Emery*, 139 F.3d at 198 (quoting *United States v. Teague*, 908 F.2d 752, 759 (11th Cir. 1990), *reh'g granted*, 953 F.2d 1525 (11th Cir.), *cert. denied*, 506 U.S. 842, 113 S.Ct. 127, 121 L. Ed. 2d 82 (1992)).

A habeas petitioner has the burden of proving that he was denied this constitutional right. It is not enough for a habeas petitioner to merely state that he told his trial attorney that he wanted to testify and that his attorney forbade him doing so. *Turcios v. Dretke*, No. H–97–0515, 2005 WL 3263918, at *6 (S.D. Tex. 2005) (citing *Underwood v. Clark*, 939 F.2d 473, 475–76 (7th Cir. 1991)); *see also*, *Davis v. Prince*, No. 11–0712, 2011 WL 5878155, at *16 (E.D. La. Sept. 28, 2011) (Wilkinson, M.J.), *report and recommendation adopted*, No. 11–0712, 2011 WL 5878152, at *1 (E.D. La. Nov. 23, 2011) (Feldman, J.); *Jones v. Cain*, No. 10–213, 2010 WL 5375949, at *3 (E.D. La. Dec.17, 2010) (Vance, J.); *Davis v. Quarterman*, No. H–06–3606, 2007 WL 1886272, at *6 (S.D. Tex. June 29, 2007). The United States Seventh Circuit Court of Appeals in *Underwood* specifically noted the potential problems likely to arise if habeas petitioners, making similar arguments, are not required to satisfy the required burden of proof. 939 F.2d at 475–76. Adopting the reasoning in *Siciliano v. Vose*, 834 F.2d 29, 31 (1st Cir.1987), the *Underwood* Court recognized that such an assertion, even if made under oath, was inadequate to meet that burden:

> [T]his barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary—and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify—to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

*Id.*, 939 F.2d at 475–76 (citations omitted); *accord Gross v. Knight*, 560 F.3d 668, 672 (7th Cir. 2009).

> Citing *Underwood*, the Fifth Circuit has also indicated the same concerns:
>
> Courts have observed that allowing a bare assertion of a right-to-testify violation to precipitate the further investment of judicial resources is problematic. *See* [*Underwood*, 939 F.2d at 476] . . . (stating that a conclusory assertion by a defendant that his right to testify was denied him is insufficient to require a hearing because "[I]t just is too facile a tactic to be allowed to succeed"). We agree that there is "a grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right . . . to testify in his own behalf without rendering the criminal process unworkable."

*United States v. Martinez*, 181 F.3d 627, 628 (5th Cir.1999) (quoting *Underwood*, 939 F.2d at 475).

Scott has not presented anything but his unsupported claim that his counsel would not allow him to testify. The record also contains nothing to support his claim. The transcript is devoid of any discussion on the record by Scott or his counsel that Scott wished to testify or was advised against it. Scott's argument, therefore, is in the same posture as that invalidated and rejected in the *Underwood* case. There is nothing in this record sufficient to prove any violation of his right to testify.

Furthermore, even assuming that his counsel denied him the right to testify, Scott fails to show that there is a reasonable probability that his testimony would have altered the verdict. On the stand, Scott would have been exposed to cross-examination regarding his guilt and character, including all his prior criminal convictions that resulted in his subsequent fourth multiple offender adjudication, which would have diminished his credibility. The prejudice posed by the likely cross-examination outweighed any benefit his unsubstantiated testimony could have lent to his defense. For these reasons, the state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, *Strickland.* Thus, Scott is not entitled to relief on this claim.

### B.    Failure to Object to Erroneous Jury Instruction (Claim No. 7)

Scott claims that his attorney rendered ineffective assistance in failing to lodge any objection to the jury instructions, which he contends failed to adequately articulate the necessary intent for a finding of guilt as to attempted second-degree murder.  The State argues that any objection to the instructions would have been meritless because the state trial court correctly instructed the jury.

As explained above, the Trial Court did not specifically address this claim.  However, the Louisiana Supreme Court found Scott did not meet the *Strickland* standard.  The Court has already determined, in addressing Scott's previous claim challenging the jury charge itself, that the instruction was harmless error.  In doing so, this Court has resolved that the jury charge error did not prejudice the verdict.  "If an error is shown to be harmless, then the error cannot satisfy the prejudice prong of *Strickland*."  *Johnson v. Blackburn*, 778 F.2d 1044, 1050 (5th Cir.1985).

Given that the charge was harmless error, Scott cannot establish that counsel's failure to object to the charge was prejudicial under *Strickland*.  *Id.*; *Riggins v. Butler*, 705 F. Supp. 1205, 1212 (E.D. La. 1989).  The state trial court's denial of relief was not contrary to, or an unreasonable application of, *Strickland*.  As such, Scott is not entitled to relief on this claim.

### C.    Failure to Appeal *Batson* Issue (Claim No. 6)

Moreover, Scott claims his appellate counsel was ineffective for failing to assign as error for appellate review the Trial Court's denial of Scott's *Batson* challenge.

It is clear that appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)."  *West v. Johnson*, 92 F.3d 1385, 1396 (5th Cir. 1996).  "Far from evidencing ineffectiveness, an appellant counsel's restraint often

benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." *Jones*, 463 U.S. at 753. [I]t is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id.*; *see also United States v. Tucker*, 434 F. App'x 355, 362 (5th Cir. 2011) (per curiam) ("The Supreme Court has recognized 'the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.'" (quoting *Jones*, 463 U.S. at 752)). To reiterate, the issues appellate counsel failed to assign must have been "clearly stronger" than those issues actually presented on appeal. *See, e.g., Diaz*, 228 F. App'x at 427; *see also Smith*, 528 U.S. at 288.

Scott's appellate counsel was not required to raise every possible claim appearing on the record. Scott's appellate counsel raised three claims: (1) failure to sever counts; (2) insufficient evidence; and (3) failure to require a unanimous verdict. Although those claims were ultimately found to be without merit, Scott has not shown that his *Batson* claim was clearly stronger. Without some showing, Scott cannot succeed under *Strickland*. As explained above, the State's reasons for the challenges were race-neutral and Scott presented no evidence demonstrating that the State's race-neutral reasons were pretextual.

Scott has failed to establish that the state courts' denial of relief on this issue was contrary to, or an unreasonable application of, Supreme Court law. Therefore, he is not entitled to relief on this claim.

## XII.  Denial of Appellate Review/Incomplete Transcripts (Claim No. 8)

In his final claim, Scott contends he was denied a full and fair record in violation of due process because the transcript of trial transcript does not include voir dire examination, opening

statements, closing arguments, and nine bench conferences, in violation of *State v. Pinion*, 968 So. 2d 131 (La. 2007) (per curiam)[75], La. Const. art. 1 §§ 2, 13, 19, and 22 and La. Code Crim. Proc. art. 843.  The State responds that Scott's claim is based on state law and is not cognizable on habeas review.

Scott raised this claim in his application for post-conviction relief, and the Trial Court found the claim to be meritless.  It also found that the claim could not to be a basis for post-conviction application review, citing La. Code Crim. Pro. Art. 930.3.[76]  In the last reasoned decision, the Louisiana Supreme Court found Scott had failed to satisfy his post-conviction burden of proof that relief should be granted.[77]

To the extent Scott raises this issue as a violation of state law, his claim must fail.  Federal habeas review may only consider constitutional violations and noncompliance with federal law as interpreted by the United States Supreme Court.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  The Court cannot provide habeas relief based on *Pinion*. *Greer v. Warden, La. State Penitentiary*, Civ. Action. No. 11–cv–1727, 2014 WL 4387295, at *9 (W.D. La. Mar. 15. 2015); *Hedgesperth v. Warden*, *La. State Penitentiary*, Civ. Action No. 11–cv–2078, 2015 WL 1089325, at *6 (W.D. La. Mar. 5, 2015).

---

[75]In *Pinion*, the Louisiana Supreme Court found that bench conferences are a material part of the proceedings and the omission of the bench conference, during which challenges for cause and peremptory challenges were made, required reversal of the defendant's conviction and sentence where it was reasonably likely that defense counsel had exhausted his peremptory challenges and it was uncertain how many cause challenges the defense made unsuccessfully and there was no other record accounting for the jury selection process. *Id.*, at 968 So. 2d at 136.

[76]St. Rec. Vol. 2 of 10, Trial Court Order, 4/17/15.

[77]*State ex rel. Scott v. State*, 201 So. 3d 252 (La. 2016) (per curiam); St. Rec. Vol. 10 of 10, La. Supreme Ct. Order, 2015-KH-1321, 9/16/16.

Scott does state that the failure to include the transcripts of voir dire examination, bench conferences, opening statements, and closing arguments violated his right to due process. As a result, he has stated a cognizable claim for federal habeas review. *See Griffin v. Illinois*, 351 U.S. 12, 19–21 (1956). Scott claims the incomplete trial transcript denied him complete appellate review. It is indisputably true that a criminal defendant has the right to adequate appellate and other review of his conviction based upon a sufficiently complete and accurate record. *Mayer v. City of Chicago*, 404 U.S. 189, 198 (1971). However, the Supreme Court has not held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief. To prevail on a claim that the record was inadequate, a petitioner must prove that the missing portion of the transcript actually prejudiced his appeal in some manner. *Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir.1998) ("[B]arring a showing that the [failure to record bench conferences during trial] resulted in 'actual prejudice,' habeas relief is unwarranted." (citation omitted)); *see also Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987) (finding petitioner failed to show the absence of voir dire transcript prejudiced his appeal); *Bozeman v. Cain*, Civ. Action No. 09–8423, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), *report and recommendation adopted*, 2010 WL 2977402 (E.D. La. July 20, 2010) (finding that petitioner's claim failed when there was no actual prejudice resulting from the failure to transcript a bench conference). Scott has made no such showing of prejudice in this case. On the contrary, the record was adequate for resolution of the claims that were actually asserted on appeal. Where, as here, the missing portions of the transcript were immaterial to the claims asserted on appeal, the record was adequate for full appellate review, and there was no denial of a meaningful appeal. *See Schwander v. Blackburn*, 750 F.2d 494, 497–98 (5th Cir.1985) (explaining that petitioner was not

denied a meaningful appeal where the omitted portions of the trial transcript were immaterial to the error alleged on direct appeal); *Thomas v. Cain*, Civ. Action No. 12–2818, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013) (finding that the record was adequate for resolution of appellate claims).

Scott claims that the lack of a complete transcript prevented him from raising the erroneous denial of his *Batson* challenge.  As explained above, Scott raised a *Batson* claim in his post-conviction application.  The Trial Court addressed the claim on the merits.  Although there was no transcript of voir dire examination, the challenge colloquy was transcribed.  Scott does not establish that the record and transcripts in his case were nothing other than sufficient for the state courts to review his post-conviction *Batson* claim.  To warrant federal habeas corpus relief on a claim that state court transcripts are unconstitutionally incomplete, the petitioner must support his claims with more than mere unsubstantiated, transparent speculation. *See Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir.1987).  Scott has not met this burden.

He also claims that the bench conferences that were unrecorded were a result of evidentiary and procedural objections to the admission of prejudicial evidence or argument.  Scott speculates that perhaps his conviction and sentence would have been reversed had he had a complete record.  Scott, however, fails to show the existence of any particular ruling he would like to challenge.  Essentially, he is requesting a more complete record in order to find potential constitutional errors, not to support specific errors he has already clearly identified.  It is well-settled that the State is not "required to furnish complete transcripts so that the defendants . . . may conduct 'fishing expeditions' to seek out possible errors at trial." *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982).  As such, Scott has not met his burden to prove that relief is warranted. *See, e.g., Johnson*

*v. Cooper*, Civ Action No. 12–2818, 2013 WL 4548526, at *8 (E.D. La. Aug. 27, 2013) ("Without a specific issue or ruling that is contained in the bench transcript to appeal, his claim lacks a relevant issue that would trigger a duty upon the State to provide him the transcript.").

The state courts' decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Thus, Scott is not entitled to federal habeas corpus relief on this claim.

## XIII. Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Scott's petition for the issuance of a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[78]

New Orleans, Louisiana, this 20th day of September, 2017

_____
**KAREN WELLS ROBY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[78]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.